**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **LEXINGTON INSURANCE CO.**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:19-cv-3131 (GMH)** |
| | ) | |
| **PADDOCK SWIMMING POOL CO.,** | ) | |
| *et al.*, | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| **PADDOCK SWIMMING POOL CO.,** | ) | |
| | ) | |
| **Cross Claimant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **P&F SERVICES, LLC,** | ) | |
| | ) | |
| **Cross Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

In this contract and negligence action, Plaintiffs are seven insurance companies (Lexington Insurance Co., Westchester Surplus Lines Insurance Co., Aspen Insurance UK Ltd., Endurance American Specialty Insurance Co., Certain Underwriters at Lloyd's London, The Princeton Excess and Surplus Lines Insurance Co., and General Security Indemnity Co. of Arizona) that proceed as subrogees of their insureds, a number of interrelated companies connected with the ownership and operation of a hotel (the "Hotel") located in the District of Columbia. Defendant Paddock Swimming Pool Company ("Paddock") was hired to renovate the rooftop pool at the Hotel. The claims arise out of water damage to Hotel property from a rainstorm that occurred while the

renovation was in progress.  The motions currently before the Court—Plaintiffs' motion for partial summary judgment and Paddock's motion for summary judgment—concern, primarily, the proper interpretation of the renovation contract between DC I&G Capital Lessee ("DC I&G"), the lessee and operator of the Hotel and Paddock (the "Renovation Contract").[1]   More specifically, the motions turn chiefly on the construction and legal consequences of a waiver-of-subrogation clause in the Renovation Contract.  For the reasons that follow, Plaintiffs' motion for partial summary judgment is denied and Paddock's motion for summary judgment is granted.

## I.  BACKGROUND

The following undisputed facts are derived from the Court's review of the record before it.[2]   During the relevant time period, La Salle Hotel Properties ("La Salle") was a Real Estate

---

[1] The documents relevant to the resolution of those motions are (1) Plaintiff's motion for partial summary judgment (ECF No. 60); (2) Paddock's motion for summary judgment (ECF No. 62); (3) Paddock's opposition to Plaintiff's motion for partial summary judgment (ECF No. 63); (4) Plaintiff's opposition to Paddock's motion for summary judgment (ECF No. 66); (5) Plaintiff's reply in further support of its motion for partial summary judgment (ECF No. 67); and (6) Paddock's reply in further support of its motion for summary judgment (ECF No. 68).  Plaintiffs have moved for partial summary judgment only against Paddock, and not against Defendant/Cross Defendant P&F Services (P&F), the subcontractor on the job, and Defendant Freddie Beall, P&F's principal.  Similarly, Paddock has moved for summary judgment only against Plaintiffs, and not against P&F.  Neither P&F nor Mr. Beall have filed a motion for summary judgment in this case.

[2] The Court's understanding of the facts of this case has been hampered by failures to comply with Local Civil Rule 7(h).  That rule requires a motion for summary judgment to be "accompanied by a statement of material facts as to which the moving party contends there is no genuine issue" and an opposition to a motion for summary judgment to be "accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated."  LCvR 7(h).  Here, Paddock did not file a separate statement of facts with its motion for summary judgment—arguably a violation of the Local Rule, which requires such a motion to be "accompanied by" that statement.  Paddock's motion does, however, include a section entitled "Material Allegations and Facts" that sets out the facts on which it relies and cites the support in the record.  ECF No. 62-1 at 2–3.  Notwithstanding the presence of that section, Plaintiffs asserted in their opposition that, because Paddock "[did] not include a separate Statement of Material Facts to Which There is No Genuine Dispute, [they] cannot dispute or respond to each allegation separately," but generally denied Paddock's representations about the "ownership and decision making" for the Hotel, its representations as to its reasonable efforts to protect the Hotel, and its "factual assertions related to the scope of the waiver of subrogation clause."  ECF No. 66 at 2.  Plaintiffs then included in their opposition a counter statement of material allegations and facts, citing the record.  *Id.* at 2–6.

As to Plaintiffs' motion for partial summary judgment, it was "accompanied by" a statement of material facts.  ECF No. 60 at 13–19.  Paddock, however, did not include a "separate concise statement of genuine issues."  LCvR 7(h).  Although the Rule would allow the Court to deem admitted the facts included in Plaintiffs' statement of undisputed material facts, *see, e.g.*, LCvR 7(h)(1) ("[T]he Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.");  *Richardson v. D.C. Dep't of Youth Rehab. Servs.*, 271 F. Supp. 3d 113, 117 (D.D.C. 2017)

Investment Trust, which purchased the Hotel in 2001.  ECF No. 62-3 at 11–12, 14 (testimony of

subrogors' 30(b)(6) deponent).  After the purchase, for tax purposes, La Salle created two entities

involved with the operation of the property:  I&G Capitol, LLC ("I&G") owned the building and

leased it to DC I&G to operate the Hotel.  *Id.* at 14–15; ECF No. 63 at 2 (Paddock's opposition to

Plaintiffs' motion for partial summary judgment); ECF No. 66 at 2 (Plaintiffs' opposition to

Paddock's motion for summary judgment).  As a subsidiary of La Salle, DC I&G is insured under

the relevant insurance policy in this case (the "Insurance Policy").

On December 5, 2017, DC I&G (identified as "Owner" in the Renovation Contract) and

Paddock (identified as "Contractor" in the Renovation Contract), using an American Institute of

Architects ("AIA") form agreement frequently used for construction/renovation jobs, executed the

Renovation Contract for Paddock to renovate the Hotel's rooftop pool.  ECF No. 62-5 at 1 (the

Renovation Contract); *see also* ECF No. 62-1 at 1; ECF No. 66 at 8; *cf. Gables Constr., Inc. v. Red

Coats, Inc.*, 228 A.3d 736, 748 (Md. 2020) (noting that "[t]he standard form contracts published

by the AIA are the most widely used and generally accepted standard contract forms in use within

the construction industry.").  The "Scope of Work" comprised tasks related to the pool's filter

room; the pool's structural box; and the pool itself, including its decking, coping, drainage, and

waterproofing.  ECF No. 62-5 at 9–11.  Pursuant to Article 9 of the Renovation Contract, entitled

"Contractor," Paddock warranted, among other things, that it would utilize new, good quality

materials and that its work would be free from defects (*id.* at 4 (Section 9.4)) and that it was

---

(taking as admitted facts in the moving party's statements of undisputed material facts where the non-movant failed
to respond with a separate statement of facts as to which it contended there were genuine and material issues); *see
also Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988) ("[A] district court judge should not be obliged to sift
through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and
determination of what may, or may not, be a genuine issue of material disputed fact."), the D.C. Circuit has cautioned
that taking facts as admitted—particularly dispositive facts—is not the "preferred first step."  *Grimes v. District of
Columbia*, 794 F.3d 83, 92 (D.C. Cir. 2015) (quoting Advisory Committee notes).  The facts in this section are
therefore those that the Court has determined from the record and the briefing to be undisputed.  Ultimately, the Court
is able to resolve both motions in their entirety by applying the law to those undisputed facts.

responsible for the acts and omissions of its own employees as well as the agents and employees of any subcontractors (*id.* (Section 9.7). Under Article 16—"Protection of Persons and Property"— Paddock promised to "take reasonable precautions for [the] safety of, and [ ] provide reasonable protection to prevent damage, injury, or loss to: [ ] employees on the Work and other persons who may be affected thereby; [ ] the Work and materials and equipment to be incorporated therein; and [ ] other property at the site or adjacent thereto." *Id.* at 7 (Section 16.1). That provision further required Paddock to "promptly remedy damage and loss to property at the site caused in whole or in part" by Paddock or a subcontractor, but "only to the extent" that Paddock was at fault. *Id.*

Article 17 of the Renovation Contract governed, as its title indicates, "Insurance." It includes, among others, the following provisions:

> **17.1**    The Contractor shall purchase from and maintain . . . insurance for protection from claims under workers' or workmen's compensation acts and other [applicable] employee benefits acts . . . , claims for damages because of bodily injury, including death, and from claims for damages, other than to the Work itself, to property which may arise out of or result from the Contractor's operations under the [Renovation] Contract . . . .

> . . . .

> **17.3**    Unless otherwise provided, the Owner shall purchase and maintain . . . property insurance upon the entire Work at the site to the full insurable value thereof. This insurance shall be on an all-risk policy form and shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Work and shall insure against the perils of fire and extended coverage and physical loss or damage including, without duplication of coverage, theft, vandalism and malicious mischief.

> **17.4**    A loss insured under Owner's property insurance shall be adjusted with the Owner and made payable to the Owner as fiduciary for the insureds, as their interests may appear, subject to the requirements of any applicable mortgage clause.

*Id.* at 7. In addition, the final section of Article 17 is the so-called subrogation waiver:

> **17.6**    The Owner and Contractor waive all rights against each other . . . and any of their subcontractors, sub-subcontractors, agents or employees, for damages caused by fire or other perils to the extent covered by property insurance obtained

pursuant to this Article 17 or any other property insurance applicable to the Work, except such rights as they may have to the proceeds of such insurance held by the Owner as fiduciary. . . .

*Id.*

La Salle held a policy underwritten by Plaintiffs (the Insurance Policy identified above) covering the "Named Insured"—defined as La Salle "and any subsidiary, associated, allied or affiliated company, corporation, firm, organization, partnership, Joint Venture, Limited Liability Company or individual, whether wholly or partially owned or controlled by [La Salle], where [La Salle] maintains an interest, or where [La Salle] is required to provide insurance, . . . and any other party in interest that is required by contract or other agreement to be named"—in "all real and personal property owned, used, leased or intended for use by the Insured or in which the Insured may have an insurable interest, or for which the Insured may be responsible for the insurance." ECF No. 62-15 at 6, 9 (the Insurance Policy).  The policy also covered "[c]ontractors' and/or subcontractors' . . . interests in property covered to the extent of the Insured's liability imposed by law or assumed by contract."  *Id.* at 10.  The policy insured against "all risks of direct physical loss of or damage to property described" in the policy.  *Id.* at 21.  The Insurance Policy also includes a subrogation clause stating that, "[i]n the event of a payment under [the] policy, [Lexington Insurance Company] shall be subrogated to the extent of such payment to all the Insured's rights of recovery therefor."  *Id.* at 27.  Importantly, the insured parties retained the right to recover under the Insurance Policy notwithstanding "[a]ny release from liability entered into . . . prior to loss." *Id.*

Paddock began work on the project and, by April 2018, the pool liner had been removed from the pool's structural box, leaving the structural box exposed.[3]  ECF No. 60 at 16 (Plaintiffs' statement of undisputed material facts); ECF No. 60-6 at 6 (testimony of Paddock's 30(b)(6) deponent).  It is undisputed that a drain line in the structural box was left uncapped at the time that heavy rains impacted the area of the hotel on April 16, 2018; it is also undisputed that during those rains, water entered the Hotel, causing damage.[4]  ECF No. 60-6 at 4, 11–12; ECF No. 60 at 16–18 (Plaintiffs' statement of undisputed material facts); ECF No. 62-1 at 3 (Paddock's memorandum in support of its motion for summary judgment); ECF No. 63 at 3 (Paddock's opposition to Plaintiffs' motion for partial summary judgment); ECF No. 66 at 5 (Plaintiffs' opposition to Paddock's motion for summary judgment).

The Hotel filed a claim pursuant to the Insurance Policy for property damage and loss of business caused by the April 16, 2018 incident.  ECF No. 62-1 at 3 (Paddock's memorandum in support of its motion for summary judgment); ECF No. 62-11 at 16–17 (deposition of Plaintiffs' Rule 30(b)(6) designee); ECF No. 62-13 at 6 (Plaintiffs' responses to Paddock's requests for admissions); ECF No. 66 at 6 (Plaintiffs' opposition to Paddock's motion for summary judgment). Plaintiffs paid the insurance proceeds—a total of $766,616.34—to La Salle for the claim.[5]  ECF

---

[3] Paddock's corporate designee testified that the pool at issue consisted of the pool liner—what one might call the pool, itself—and a structural box in which the pool liner sat.  ECF No. 60-6 at 4–5.  Because pools naturally leak, the structural box included two drains, known as "weep drains," to catch the leaks.  *Id.* at 5–6, 10.

[4] The party responsible for leaving the drain uncapped is in dispute, with Plaintiffs asserting that either Paddock or subcontractor P&F was at fault.  ECF No. 60 at 18.  Paddock insists that P&F was responsible.  ECF No. 62-1 at 3. There is also a dispute about whether the uncapped drain was the cause of the water damage.  Plaintiffs argue that the uncapped drain was the source and cause of the water damage.  ECF No. 60 at 18.  Paddock contends that the Hotel's improper maintenance of drains in the 10th floor mechanical room and a breached containment system in that room, together with P&F's negligence in failing to cap the drain, caused the damage.  ECF No. 62-1 at 3.  In their Answers, P&F and Mr. Beall generally deny the allegations as to their liability.  *See* ECF Nos. 45–46.

[5] LaSalle made a claim for over $2 million.  ECF No. 62-11 at 17.  Plaintiffs paid the amount that reflected the emergency work and temporary repairs done, as well as an amount for loss of business.  *Id.*  LaSalle did not complete permanent repairs because the Hotel was sold.  *Id.*

No. 62-1 at 3 (Paddock's memorandum in support of its motion for summary judgment); ECF No. 62-11 at 17 (deposition of Plaintiffs' Rule 30(b)(6) designee); ECF No. 62-12 (summary of payments under the Insurance Policy due to the April 16, 2018 loss); ECF No. 66 at 6 (Plaintiffs' opposition to Paddock's motion for summary judgment).

In September 2019, stepping into the shoes of the insureds, Plaintiffs filed a complaint alleging breach of contract and negligence against Paddock in D.C. Superior Court, which Paddock removed to this Court shortly thereafter. *See generally* ECF No. 1. The Amended Complaint, which alleges the same two claims against Paddock,[6] indicates that Plaintiffs filed the action as subrogees of the following entities: LaSalle Hotel Properties; LaSalle Hotel Operating Partnership, L.P.; I&G; LaSalle Hotel Lessee, Inc.; and DC I&G (collectively, the "LaSalle Entities").[7] ECF No. 34 at 1. Paddock and Plaintiffs have now filed motions for summary judgment. Paddock, which seeks summary judgment in its favor on both claims against it, argues that Plaintiffs are barred from bringing this action against it pursuant to both the subrogation waiver included in the Renovation Contract at Section 17.6 and the "anti-subrogation rule," by which an insurer may not exercise its right of subrogation against its own insured, on the theory that Paddock is itself an insured under the Insurance Policy due to its coverage of "[c]ontractors' and/or subcontractors' . . . interests in property covered to the extent of the Insured's liability imposed by law or assumed by contract." ECF No. 62-1 at 1–2; ECF No. 62-15 at 10. It further argues that the "economic loss rule," which prohibits "a plaintiff who suffers only pecuniary injury as a result of the conduct of another [from] recover[ing] those losses in tort," *Aguilar v. RP MRP*

---

[6] As noted above, claims by Plaintiffs and by Paddock against P&F Services and Freddie Beall are not at issue here.

[7] Plaintiffs also sue as subrogees of Pebblebrook Hotel Trust; Pebblebrook Hotel, L.P.; Ping Merger OP, LP; and Ping Merger Sub, LLC, who are identified as LaSalle's successors-in-interest via a series of mergers that occurred on November 30, 2018. ECF No. 34 at 1, 5–6.

*Wash. Harbour, LLC*, 98 A.3d 979, 982 (D.C. 2014) (quoting *Apollo Grp., Inc. v. Avnet, Inc.*, 58 F.3d 477, 479 (9th Cir. 1995)), bars Plaintiffs' negligence claim.  ECF No. 62-1 at 15–18.

Plaintiffs have moved for partial summary judgment, seeking judgment as a matter of law on their contract claim based on the following provisions in the Renovation Contract: Section 9.4, warranting that Paddock's work would be free from defects; Section 9.7, agreeing that Paddock would be responsible for the acts and omissions of its employees and its subcontractors; Section 16.1, requiring Paddock to take reasonable precautions to prevent damages to the property and to promptly remedy damage caused by it or its subcontractors; and Section 17.1, mandating that Paddock maintain insurance, including for damage to property other than the Work property, that was caused by Paddock's operations.  ECF No. 60 at 6.  That is, Plaintiffs argue that Paddock breached its obligations under the Renovation Contract because Paddock's subcontractor "failed to cap or otherwise secure the drain line that was the root cause of the loss."  *Id.* at 7.  In addition, Plaintiffs ask the Court to hold that the subrogation waiver does not apply to this situation because the claimed damage was not to property within the Scope of Work defined by the Renovation Contract.  *Id.* at 8–12.

## II.    LEGAL STANDARD

### A.    Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In

adjudicating such a motion, all reasonable inferences from the facts in the record must be made in favor of the nonmoving party. *Anderson*, 477 U.S. at 255. To prevail on such a motion, the moving party must show that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To do this, it may cite the record, including "affidavits or declarations." Fed. R. Civ. P. 56(c)(1)(A). Factual assertions made in the moving party's affidavits or declarations may be accepted as true in the absence of contrary assertions made in affidavits, declarations, or documentary evidence submitted by the nonmoving party. *Neal v. Kelly*, 963 F.2d 453, 456 (D.C. Cir. 1992).

For issues on which the nonmoving party would bear the ultimate burden of proof, a party moving for summary judgment can carry its burden on the summary judgment motion by pointing out "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party carries its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, it must show that a rational trier of fact could find in its favor. *Id.* at 587. Thus, "'conclusory allegations' and 'unsubstantiated speculation,' whether in the form of a plaintiff's own testimony or other evidence submitted by a plaintiff to oppose a summary judgment motion, 'do not create genuine issues of material fact.'" *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 61 (D.D.C. 2015) (quoting *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 200 n.12 (D.D.C. 2008)), *aff'd*, No. 15-5137, 2015 WL 9309960 (D.C. Cir. Dec. 4, 2015). Nor can a sufficiently supported motion for summary judgment be defeated by statements and evidence that is "rendered unreasonable given other undisputed evidence in the record." *Id.* at 74; *see also Wadley v. Aspillaga*, 209 F. Supp. 2d 119, 125 (D.D.C. 2002) (granting motion for

summary judgment where "facts and arguments proffered by plaintiffs are immaterial, illogical, or conclusory").

### B.    Subrogation

"Where one party has paid the debt of another, justice requires that the payor be able to recover his loss from the one who should have paid it . . . ." *Nat'l Union Fire Ins. Co. v. Riggs Nat'l Bank*, 646 A.2d 966, 968 (D.C. 1994). Such recoupment is frequently accomplished through subrogation, which "simply means substitution of one person for another; that is, one person [the payor or insurer] is allowed to stand in the shoes of another [the debtor or insured] and assert that person's rights against a third party." *U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 97 n.5 (2013) (quoting 1 D. Dobbs Law of Remedies § 4.3(4), at 604 (2d ed. 1993)). Although subrogation can be based on equitable principles and, as such, would not "depend upon showing a contract provision or formal assignment" of rights, but rather could be shown by "the mere fact of payment by a third party," so-called "'conventional subrogation' arises from an express or implied agreement between the payor and the debtor or creditor." *Nat'l Union Fire* at 968–69. This case is in the realm of the conventional, as the Insurance Policy contains an express agreement that, "[i]n the event of any payment under this policy, [Lexington Insurance] Company shall be subrogated to the extent of such payment to all the Insured's rights of recovery therefor." ECF No. 62-15 at 27.

No matter which type of subrogation is at issue, "an insurer can take nothing by subrogation but the rights of the insured, and is subrogated to only such rights as the insured possesses." *Water Quality Ins. Syndicate v. United States*, 522 F. Supp. 2d 220, 231 n.8 (D.D.C. 2007); *see also Malacca Corp. v. Travelers Indem. Co.*, 421 F. Supp. 2d 137, 139 (D.D.C. 2006) ("A subrogated insurer takes nothing by subrogation but the rights of the insured."). Put another way, "an essential

element of subrogation is that the insured have a viable claim against a third party."  16 Steven

Plitt, *et al.*, Couch on Insurance § 224:76 (3d ed.) [hereinafter, Couch on Insurance].  Thus, a

subrogated insurer's claims are subject to the same defenses that the defendant would have against

the insured.  *See, e.g.*, *Vigilant Ins. Co. v. Am. Mech. Servs. of Md., LLC*, 816 F. Supp. 2d 114,

118–19 (D.D.C. 2011) (applying a defense arising from a provision in a contract between the

defendant and the insured in an action brought by the subrogated insurer).

### III.    DISCUSSION

There are many theories at play here.  Plaintiffs claim that the evidence establishes that

Paddock breached the Renovation Contract as a matter of law.  Paddock interposes a number of

defenses: (1) that Plaintiffs' right to prosecute these subrogated claims has been waived pursuant

to Section 17.6 of the Renovation Contract; (2) that the "anti-subrogation rule" bars their claims;

and (3) that the negligence claim cannot proceed because of the "economic loss rule."  Each

presents primarily a legal question.  However, there is a subsidiary factual dispute about whether

the Renovation Contract (and its subrogation waiver) binds any entities beyond its signatories—

Paddock and DC I&G.  Ultimately, both Plaintiffs' motion for partial summary judgment on the

breach of contract claim and Paddock's motion for summary judgment on both the breach of

contract and the negligence claims can be resolved by interpreting the meaning and effect of

Section 17.6 of the Renovation Contract and the application of the anti-subrogation rule.  More

specifically, the Court finds that, no matter whether all of the LaSalle Entities are bound by the

Renovation Contract or only DC I&G is, (1) Plaintiffs' breach of contract claim is barred in its

entirety by Section 17.6 and (2) both the breach of contract and the negligence claims are barred

by the anti-subrogation rule.  There is therefore no need to analyze Paddock's arguments regarding

the entities that should be deemed bound by the Renovation Contract or the application of the economic loss rule.

### A.    Contractual Waiver of Subrogation

The provision at the heart of this dispute is Section 17.6, which the parties designate the subrogation waiver.[8]  As noted, it provides, in relevant part:

> [DC I&G] and [Paddock] waive all rights against each other . . . for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Article 17 or any other property insurance applicable to the Work, except such rights as they may have to the proceeds of such insurance held by the Owner [i.e. D.C. I&G] as fiduciary. . . .

ECF No. 62-5 at 7.

Paddock argues that this provision means that Plaintiffs (as subrogees of their insured, DC I&G) have waived the claims here, which are "for damages caused by" a peril that was "covered by property insurance" that satisfied the requirements of Article 17 of the Renovation Contract—specifically, Section 17.3, which dictated that DC I&G should maintain property insurance "upon the entire Work at the site to the full insurable value thereof" in the form of an "all-risk policy" that "include[s] [the] interests" of DC I&G, Paddock, and any subcontractors "against the perils of fire and extended coverage and physical loss or damage."  *See* ECF No. 62-1 at 7–13; ECF No. 62-5 at 7.  Plaintiffs, on the other hand, contend that the waiver "does not apply to damage to property that does not fall within the term 'Work' as defined in the [Renovation Contract]."  ECF No. 60 at 9.

Interpreting this provision does not require the Court to consider any disputed facts or to break new ground.  The principles governing contract interpretation under District of Columbia

---

[8] "Subrogation waiver" or "waiver-of-subrogation clause" are, perhaps, misnomers.  Although the effect is that rights of subrogation are unavailable for certain claims, the provision actually waives certain claims, whether brought by the parties to the Renovation Contract or by a subrogee.

law are familiar.[9]   The jurisdiction "adheres to an 'objective law' of contracts, meaning 'the written language embodying the terms of an agreement will govern the rights and liabilities of the parties [regardless] of the intent of the parties at the time they entered into the Renovation Contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake.'"   *Dyer v. Bilaal*, 983 A.2d 349, 354–55 (D.C. 2009) (alteration in original) (quoting *DSP Venture Grp, Inc. v. Allen*, 830 A.2d 850, 852 (D.C. 2003)).   In interpreting a contract, courts "examine the document on its face, giving the language its plain meaning."   *Dyer*, 983 A.2d at 355 (internal quotation marks omitted) (quoting *Tillery v. District of Columbia Contract Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006)).

Here, DC I&G and Paddock "waive[d] all rights against each other . . . for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Article 17 or any other property insurance applicable to the Work."   ECF No. 62-5 at 7.   The plain meaning of that provision is that DC I&G cannot pursue a claim against Paddock (either directly or by subrogation) for damage that is covered by property insurance obtained under the Renovation Contract or any other property insurance that might cover the Work.   The damage here was undisputedly covered by property insurance—the Insurance Policy—and Plaintiffs undisputedly

---

[9] The Renovation Contract states that it will be governed by "the law of the place where the Project is located"—that is, the District of Columbia.   ECF No. 62-5 at 8.   "[I]t is well established that in diversity cases (such as this one), 'the law of the forum state supplies the applicable choice-of-law standard' in the first instance."   *Sickle v. Torres Advanced Enter. Sols.*, No. 11-cv-2224, 2020 WL 5530357, at *7 (D.D.C. Sept. 14, 2020) (quoting *Williams v. First Gov't Mortg. & Inv'rs Corp.*, 176 F.3d 497, 499 (D.C. Cir. 1999).   "[U]nder the District of Columbia's choice-of-law rules, courts enforce express contractual choice-of-law provisions 'so long as there is some reasonable relationship with the state specified.'"   *Sickle*, 2020 WL 5530357, at *7 (quoting *Ekstrom v. Value Health, Inc.*, 68 F.3d 1391, 1394 (D.C. Cir. 1995)).   That requirement is met here, as the place of performance, location of the subject matter, and location of the insured risk are all the District of Columbia.   *See, e.g.*, *Adolph Coors Co. v. Truck Ins. Exchange*, 960 A.2d 617, 620 (D.C. 2008) (looking to those factors, among others, to determine which state's law to apply to a contract dispute).   As this is essentially a contract dispute and, indeed, can be resolved by applying principles of contract law, the Court will apply the law of the District of Columbia.

paid on that insurance claim.  ECF No. 62-11 at 16–17; ECF No. 62-12; ECF No. 62-13 at 6.  Thus, the claims here are waived.

Although the D.C. Court of Appeals has not interpreted a clause similar to this one, many other courts around the country have,[10] and Paddock's interpretation has clearly emerged as the consensus view over the approach championed by Plaintiffs.  *See, e.g.*, *Lexington Ins. Co. v. Entrex Commc'n Servs., Inc.*, 749 N.W.2d  124, 133 & n.30 (Neb. 2008) (noting that the courts adopting the approach that "the waiver applies to all damages insured by the owner's property insurance policy, regardless of whether they represent damages to the Work or non-Work property[,] . . . represent the majority" and collecting cases); *see also, e.g.*, *Liberty Mut. Fire Ins. Co. v. Fowlkes Plumbing, L.L.C.*, 290 So.3d 1257, 1259 (Miss. 2020) (describing the majority and minority approach similarly); *ACE Am. Ins. Co. v. Am. Med. Plumbing, Inc.*, 206 A.3d 437, 444 (N.J. Super. Ct. App. Div. 2019) (noting that "the majority . . . of other courts . . . have rejected the argument" that the "subrogation waiver is limited to damage to the Work").

Under this majority view, provisions with nearly identical wording to that at issue here have been held to waive the subrogation of any claim of property damage "to the extent the property is covered by insurance" required by the parties' agreement.  *Fowlkes Plumbing*, 290 So.3d at 1259.  The cases point out that the plain language of the provision waives claims "for damages caused by fire or other perils *to the extent covered by property insurance obtained pursuant to this [section of the Renovation Contract] or other property insurance applicable to the Work*, except such rights as they have to the proceeds of such insurance held by the Owner as fiduciary." *Bd. of Comm'rs of Jefferson Cnty. v. Teton Corp.*, 30 N.E.3d 711, 715 (Ind. 2015).  As the Indiana Supreme Court explained:

---

[10] Again, the Renovation Contract used an American Institute of Architects (AIA) form that is frequently used in construction and renovation projects.  ECF No. 62-1 at 1; ECF No. 66 at 8.

> [T]o determine which [ ] damages are covered by the subrogation waiver, we must look at everything that follows the phrase "to the extent." The positioning and plain meaning of the word "covered" restricts the scope of the subrogation waiver based on the source and extent of the property insurance *coverage,* not the nature of the *damages* or of the *damaged property*.

*Id.* at 716. "In sum, if property damages (of any sort) are 'covered' by an insurance policy that fits within one of these two descriptions, the waiver applies." *Id.* As the U.S. District Court for the District of Maine explained:

> [T]he waiver clause is coextensive with the property insurance actually procured. If the property insurance actually procured covers more than just the location of a particular contractor's own work, the waiver of subrogation must still be effective as to all fire damages covered by insurance, not just fire damage to the "Work" itself.

*ASIC II Ltd. v. Stonhard, Inc.*, 63 F. Supp. 2d 85, 92 (D. Me. 1999) (footnote omitted). Moreover, the party providing the property insurance need not "obtain separate insurance (*i.e.,* 'property insurance obtained pursuant to [the contract]')," but may rely on an "existing policy (*i.e.,* 'other property insurance applicable to the Work')." *Id.* The fact that the preexisting insurance that is relied on to comply with the contract "may [be] . . . more extensive than what was required" is immaterial, because "[t]he waiver clause does not restrict the waiver of damages to "Work" but to the proceeds of any [property] insurance provided under [the contract]." *Id.*; *see also id.* at 93 ("There is no compelling distinction between an insurance policy actually procured at the time of the contract, and an existing all-risk policy that meets the insurance procurement requirements of the contract in the first instance."). Numerous other courts have agreed with this interpretation.

*See, e.g.*, *Fowlkes Plumbing*, 290 So.3d at 1259 ("The phrase 'to the extent the property is covered by insurance' means that any damage that is paid for by insurance proceeds is covered. Additionally, the phrase 'applicable to the work' means any insurance that insures the work, which is not a limit on recovery for only damages to work property . . . ."); *Entrex Commc'ns*, 749

N.W.2d at 135 ("The court [in *Lloyd's Underwriters v. Craig & Rush, Inc.*] explained, 'The waived claims are *not* defined by what property is harmed (i.e., "any injury to the Work"); instead, the scope of waived claims is delimited by the *source* of any insurance proceeds paying for the loss (i.e., whether the loss was paid by a policy "applicable to the Work").' We agree." (quoting *Lloyd's Underwriters*, 32 Cal. Rptr. 2d 144, 148 (Cal. Ct. App. 1994))); *Behr v. Hook*, 787 A.2d 499, 506 (Vt. 2001) ("The waiver-of-subrogation provision explicitly applies to the extent that there is 'property insurance obtained pursuant to' the contract. . . . It is undisputed that plaintiffs obtained insurance coverage that compensated them for their entire loss. Therefore, the waiver-of-subrogation provision applies to the extent of that coverage."); *Am. Med. Plumbing*, 206 A.3d at 443 ("[The subrogation-waiver provision] applies the waiver to any insured damage, . . . whether to the Work, to the Project, or to other insured property—so long as the policy covering the damage falls within one of the two categories identified: 'property insurance obtained pursuant to [the relevant section in the agreement]' or 'other property insurance applicable to the Work.'"); *Westfield Ins. Grp. v. Affinia Dev. LLC*, 982 N.E.2d 132, 141, 144 (Ohio Ct. App. 2012) (stating that "the majority of jurisdictions considering the issue criticize the work/non-work distinction as ignoring the language defining the scope of claims falling within the waiver clause. These courts interpret the scope of the waiver as limited to the proceeds of the insurance provided under the contract, and ask whether the owner's policy was broad enough to cover both Work and non-Work property and whether the policy paid for damages" and determining that "the reasoning adopted by the majority of jurisdictions addressing this issue to be persuasive" because it "is consistent with the plain and unambiguous language of the [c]ontract and furthers the purpose of the waiver clause as a risk-shifting provision").

Plaintiffs urge a different approach, arguing that applying the majority view renders certain other contractual provisions mere surplusage and that, reading the contractual provisions applicable to insurance together make it "clear that Paddock remained responsible for damage to non-Work property, whether caused by Paddock or its subcontractors." ECF No. 60 at 8–12; ECF No. 66 at 7–11; ECF No. 67 at 7–10.  Specifically, Plaintiffs point to Sections 17.3 and 17.4:

> **17.3**   Unless otherwise provided, the Owner shall purchase and maintain . . . property insurance on the entire Work at the site to the full insurable value thereof . . . and shall include the *interests* of the Owner, the Contractor, [and] Subcontractors *in the Work* and shall insure against the perils of fire . . . and physical loss or damage . . . .

> **17.4**   A loss insured under Owner's property insurance shall be adjusted with the Owner and made payable to the Owner as fiduciary for the insureds, *as their interests may appear* . . . .

ECF No. 60 at 9 (alterations in original) (quoting ECF No. 62-5 at 7).  They argue that, because (1) Section 17.3 "requires insurance [only] up to the value of the Work, including the *interests* of Paddock and its subcontractors *in the Work*"; (2)  Section 17.4 "states that losses will be adjusted with Owner, and made payable to Owner 'as fiduciary for the insureds as their *interests* may appear"; and (3) the only insurable interest Paddock had "was the value of their interest in the labor, equipment[,] and materials they used in the Work"; then (4) "the waiver of subrogation clause—tied to  insurance proceeds that the Owner held as fiduciary for Paddock and its subcontractor 'as their interests may appear'—only applies to insurance proceeds applicable to the Work." ECF No. 60 at 10.  Plaintiffs also contend that Paddock's interpretation renders meaningless the portion of the subrogation waiver provision stating that DC I&G "waive[d] its rights to the extent covered by property insurance applicable to the Work, 'except such rights as they may have to the proceeds of such insurance held by Owner as fiduciary.'"  ECF No. 66 at 9 (quoting ECF No. 62-5 at 7).

The Court rejects Plaintiffs' reliance on the language of Section 17.3 (which required DC I&G to maintain property insurance on the Work to its full insurable value, including the interests of DC I&G as well as Paddock and its subcontractors) to support its argument that subrogation is waived only as to damage to property that is the subject of the Work.  It ignores the plain language of the subrogation waiver, which, as discussed above, contains no language that could be interpreted to limit its scope to claims based only on damage to the Work.  Again, numerous cases have made that precise point.  For example, in *Teton Corp.*, the Indiana Supreme Court explained that the fact that the renovation contract at issue there—like the one here—required the property owner "to procure insurance only for the work, not the entire [building in which the work was being performed]" was no reason to interpret the scope of the waiver "just as narrow[ly]."  *Teton Corp.*, 30 N.E.3d at 716.  Rather, "even though the scope of the insurance requirement is indeed narrow, the plain meaning of the waiver is not.  Nothing in the [ ] contract links the scope of the waiver to the minimum coverage property owners must procure under [the agreement]."  *Id.*; *see also ASIC II Ltd.*, 63 F. Supp. 2d at 92 (rejecting the argument that the requirement in a contract that the property insurance procured cover "the interest of the Owner, Contractor, subcontractors, and sub-subcontractors in the Work" limited the scope of the waiver of subrogation to damage to the Work itself); *Fed. Ins. Co. v. Woodruff Constr.*, 826 N.W.2d 516 (Iowa Ct. App. 2012) (Table) ("To adopt [the insurer's] proposed reading would require rearranging the contract language so the waiver would be 'for damages caused by fire or other causes of loss covered by property insurance obtained pursuant to this Section [ ] or other property insurance *to the extent* applicable to the Work.'  As written, the waiver looks to whether the loss was covered by insurance, not whether the loss was to 'the work.'."); *cf. Am. Med. Plumbing*, 206 A.3d at 443 (finding that subrogation was waived for claims of damage to non-Work property where the owner's property insurance

18

policy exceeded the coverage required by the agreement).  That reasoning is sound, based as it is in the plain meaning of the language of the relevant provisions, which is materially identical to the language in the Renovation Contract, here.

Section 17.4 of the Renovation Contract is even further afield.  That provision states that "[a] loss insured under Owner's property insurance shall be adjusted with the Owner and made payable to the Owner as fiduciary for the insureds, as their interests may appear."  ECF No. 62-5 at 7.  That is, when there is a loss insured under the Owner's property insurance, the Owner and the Owner's insurer will determine the amount to be paid.  *See Adjust*, Black's Law Dictionary (11th ed. 2019) ("To determine the amount that an insurer will pay an insured to cover a loss."). Once that amount is determined, it will be paid to the Owner.  If other insureds have an interest in those proceeds—if they are due part or all of the proceeds because they have suffered a covered loss—the Owner holds the amount due them as a fiduciary, that is, as an entity that is "required to act for the[ir] benefit" as to the insurance proceeds.  *Fiduciary*, Black's Law Dictionary (11th ed. 2019).  Thus, for example, if Paddock caused damage to DC I&G's property and also to Paddock's own property, under this provision the insurance company would pay DC I&G the entire adjusted amount, including the amount due Paddock for its loss, which DC I&G would hold in a fiduciary capacity for the benefit of Paddock.  If there were a dispute about the amount owed Paddock, that claim would not be waived; rather, Paddock could sue DC I&G for the amount to which it was allegedly entitled.   Plaintiff asserts, baldly, that "Paddock's reading of the waiver clause improperly renders [Section 17.4] mere surplusage."  ECF No. 66 at 9.  But how?  In the example above, DC I&G would hold funds for Paddock as a fiduciary even though subrogated claims were waived for damage to both Work and non-Work property.[11]

---

[11] Perhaps Plaintiffs mean to argue that, because Paddock would be entitled to proceeds from the Insurance Policy only for loss to its own property and any such loss would necessarily be related to the Work, then the subrogation

Indeed, Plaintiffs appear to misinterpret the very clause upon which they rely.  In their reply memorandum, Plaintiffs identify the "relevant part" of the subrogation waiver provision, Section 17.6, as the following (the emphases are Plaintiffs'):

> The Owner and Contractor waive all rights against each other and . . . any of their subcontractors, sub-subcontractors, agents or employees, for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Article 17 or any other property insurance *applicable to the Work*, except such rights as they may have to the proceeds of such insurance *held by the Owner as fiduciary*. . . .

ECF No. 67 at 8 (quoting ECF No. 62-5 at 7).  They then argue that

> the waiver clause itself includes the requirement that the insurance proceeds be "applicable to the Work" and "held by Owner as fiduciary."  Based on the language of the waiver clause itself, the waiver does not apply to any insurance proceeds but rather, only those proceeds that both apply to the Work and are held by Owner as fiduciary.

*Id.* (emphasis omitted); *see also* ECF No. 60 at 9.  But, as the careful reader will have noticed, Plaintiffs have it wrong.  Even if one were to accept that the waiver, by its terms, applies only to claims of damage to the Work—that is, that only claims of damage to Work property are barred (a conclusion that, as discussed above, finds no traction in the language of the Renovation Contract)—the provision at issue mentions proceeds held by the Owner as fiduciary only in order to identify claims that are *excepted* from the waiver—that is, claims related to insurance proceeds held by DC I&G as fiduciary for other insureds.  Thus, it is not, as Plaintiffs would have it, that the waiver applies "only [to] those proceeds that both apply to the Work and are held by Owner as fiduciary."  ECF No. 67 at 8.  Rather, claims to proceeds held by the Owner as fiduciary are explicitly *not* barred by the waiver.  As such, there is no textual basis for Plaintiffs' attempts to graft onto the Renovation Contract's delineation of the claims to which the waiver applies—as

---

waiver must apply only to claims regarding damage to the Work.  ECF No. 60 at 9; ECF No. 67 at 8.  But that argument suffers from the same defect as the argument derived from Section 17.4: it ignores the plain language of the subrogation waiver, which does not include any such limitation.

explained above, claims "for damages caused by fire or other perils to the extent covered by property insurance" (ECF No. 62-5 at 7)—a requirement that the proceeds that are the subject of those claims be "held by the Owner as fiduciary." In short, Plaintiffs appear to fundamentally misunderstand the provision that they attempt to construe.

Plaintiffs' remaining arguments are similarly unconvincing. For example, their motion for summary judgment points to Section 16.1 of the Renovation Contract, which requires Paddock to "take reasonable precautions for [the] safety of, and [ ] provide reasonable protection to prevent damage, injury, or loss to: [ ] employees on the Work and other persons who may be affected thereby; [ ] the Work and materials and equipment to be incorporated therein; and [ ] other property at the site or adjacent thereto" and also to "promptly remedy damage and loss to property at the site caused in whole or in part." ECF No. 62-5 at 7; *see* ECF No. 60 at 11. But that provision says nothing about insurance or subrogation.

Plaintiffs also emphasize that Section 17.1 of the Renovation Contract requires Paddock to purchase insurance for "claims from damages, other than to the Work itself, to property which may arise out of or result from Contractor's operations under the [Renovation] Contract." ECF No. 60 at 12 (emphasis omitted); ECF No. 62-5 at 7. This, they argue, supports their position that "Paddock remained responsible for damage to non-Work property, whether caused by Paddock or its subcontractors." ECF No. 60 at 12. Again, that interpretation ignores the scope of the subrogation waiver, which waives claims covered by property insurance. As the Indiana Supreme Court held in interpreting a similar contract, the provision requiring the contractor to maintain its own liability insurance "ha[d] no impact on the subrogation waiver." 30 N.E.3d at 714. The court reasoned that

> no such allocation between property and liability insurance [was] expressed anywhere in the contract. Rather, the waiver of subrogation plainly applies to

> "damages caused by fire or other perils"—without exception or distinction—"to the extent covered by *property* insurance." This necessarily implies that [the Contractor's] duty to procure *liability* insurance had no bearing on damages that are already covered by the Owner's property insurance.

*Id.* at 716–17; *see also Lloyd's Underwriters*, 32 Cal. Rptr. at 147–48 ("[The insurers] claim the parties intended to allocate responsibilities for losses among themselves by making Owner responsible for insuring against loss to the project itself and Contractors responsible for insuring against any other loss under its liability insurance. . . . This contention, however, ignores the language defining the scope of claims falling within the waiver clause. The waived claims are *not* defined by what property is harmed . . . ; instead, the scope of waived claims is delimited by the *source* of any insurance proceeds paying for the loss (i.e., whether the loss was paid by a policy 'applicable to the Work')."). Similarly, Plaintiffs' argument fails to take into account that the liability insurance required by Section 17.1 covers risks that would not be covered by the property insurance required by Section 17.6. By its terms, Section 17.1 requires, for example, coverage for "claims under workers' or workmen's compensation acts and other [applicable] employee benefits acts." ECF No. 62-5 at 7. More, as another court has pointed out, the requirement that the contractor maintain liability insurance is not rendered nugatory by the subrogation waiver, because

> [t]he contractor's liability insurance . . . provide[s] an additional layer of coverage for damage that the owner's property insurance may not reach. For example, if the owner's losses exceed its policy limit, the contractor's liability insurance could cover at least part of the balance. The liability insurance would also provide a source of compensation to injured third parties, who might otherwise seek remedies from the owner.

*Am. Med. Plumbing*, 206 A.3d at 446–47.

The Court therefore finds that the plain meaning of the Renovation Contract —a standard AIA form—evinces an intention to "shift the risk/loss to the insurer," barring any claim by DC I&G for damages allegedly caused by Paddock to the extent that the loss was covered by the

Insurance Policy.  *Gables Constr.*, 228 A.2d at 749.  As the Third Circuit has noted, courts considering similar AIA form contracts "have concluded essentially that the contract operates to shift to the owner the ultimate risk of loss which is then transferred to the insurer for valuable consideration, leaving the insurer no right to proceed by subrogation against a subcontractor with respect to property loss." *Com. Union Ins. Co. v. Bituminous Cas. Corp.*, 851 F.2d 98, 101 (3rd Cir. 1988).  That interpretation also has the salutary effect of reducing litigation by causing construction losses to be resolved by insurance claims rather than through litigation.  *Id.* (noting that the purpose of the subrogation waiver is "the avoidance of disputes among construction project participants," a policy "best effectuated by interpreting the clause as effectively abrogating any subrogation right of the owner's insurer against the subcontractor"); *see also Fowlkes Plumbing*, 290 So. 3d at 1260; *Gables Constr.*, 228 A.2d at 750.

Indeed, the facts indicate that outcome was within the contemplation of the parties to that Insurance Policy.  LaSalle paid a hefty premium—according to the Insurance Policy, over $830,000 for a year of coverage—for a policy that covered "[c]ontractors' and/or subcontractors' . . . interests in property . . . to the extent of the Insured's liability . . . assumed by contract" and insured against "all risks of direct physical loss of or damage to property."  ECF No. 62-15 at 3, 10, 21.  It also explicitly allowed the insureds to recover under the policy even on claims, like this one, for which they had entered into a release from liability prior to the loss.  *Id.* at 27 ("Any release from liability entered into by the Insured prior to loss hereunder shall not affect this policy or the right of the Insured to recover hereunder.").  Had the Plaintiffs wanted to protect themselves from such claims or had LaSalle not wanted to pay for such coverage, they could have made a different agreement.

The determination that DC I&G waived claims for damage covered by the Insurance Policy leads inexorably to the conclusion that Plaintiffs' motion for partial summary judgment—which seeks judgment as a matter of law in their favor only on the breach of contract claim—must be denied and, conversely, Paddock's motion for summary judgment as to the breach of contract claim must be granted.  As noted above, a subrogated insurer steps into the shoes of the insured, taking the rights the insured has, but nothing more.  *See, e.g.*, *Malacca Corp.*, 421 F. Supp. 2d at 139.  Thus, for an insurer to prosecute a subrogated claim against a third party, "the insured [must] have a viable claim against [that] third party." 16 Couch on Insurance § 224:76.  Here, because under Section 17.6 of the Renovation Contract, DC I&G has no claim against Paddock for losses covered by the Insurance Policy—whether pleaded as a breach of contract claim or a negligence claim—Plaintiffs standing in the shoes of DC I&G have no cause of action against Paddock either.

Undeterred, Plaintiffs also take the position that only DC I&G is subject to the subrogation waiver *because only DC I&G signed the Renovation Contract.*  ECF No. 66 at 12 ("Paddock, itself, admits that DC I&G is the contracting party.  The [Renovation] Contract, moreover, unambiguously identifies DC I&G as 'the Owner.'" (internal citation omitted)).  It is a fundamental principle of contract law that, "[i]n order to sue for damages on a contract claim, a plaintiff must have either direct privity or third party beneficiary status." *Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1064 (D.C. 2008) (quoting *Alpine Cnty. v. United States*, 417 F.3d 1366, 1368 (Fed. Cir. 2005)); *see also German All. Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912) (noting the "exceptional privilege" of allowing "a stranger . . . [to] su[e] for a breach of an agreement to which he is not a party").  According to Plaintiffs, only DC I&G was in privity of contract with Paddock.  But if that position is correct, *only* DC I&G (of all the LaSalle Entities) had the right to maintain a breach of contract claim against Paddock.  However,

24

as discussed above, DC I&G waived its rights to bring such a claim in that agreement.  As subrogees of DC I&G, Plaintiffs hold only the rights that DC I&G held—no more and no less. Plaintiffs are a quandary, then.  Either they have no right to sue for breach of contract because that right belongs only to DC I&G and the Renovation Contract's subrogation waiver bars such a claim (as well as a negligence claim based on this loss to the extent it is brought as a subrogated claim of DC I&G) or they are third-party beneficiaries of the Renovation Contract and are therefore bound by its terms, which waive *all* claims for losses that were covered by the Insurance Policy, *see, e.g.*, *Bituminous Coal Operators' Ass'n v. Connors*, 867 F.2d 625, 632 (D.C. Cir. 1989) ("In the usual case, a third party beneficiary that brings a contract claim steps into the shoes of the promisee and is therefore subject to any claim or defense that  the promisor would have against the promisee.").  At the very least, then, Plaintiffs' breach of contract claim cannot stand, because any Plaintiff that could bring such a claim (that is, any subrogee of a LaSalle Entity that is bound by the Renovation Contract) has waived it.

As to the negligence claim, it is a claim for damage that was covered by the Insurance Policy; thus, DC I&G has waived that claim through Section 17.6.  Whether the remaining Plaintiffs can bring the claim depends on (1) whether they are, as Paddock urges, bound by the subrogation waiver through equitable estoppel or because they constitute a single enterprise and (2) if they are not, whether another doctrine, such as the anti-subrogation rule or the economic loss rule bars the claims.  Because, as discussed below, the anti-subrogation rule bars all of the claims brought by Plaintiffs, it is unnecessary to address Paddock's other arguments.

### C.   Anti-Subrogation Rule

"[I]t has long been held that no right of subrogation can arise in favor of an insurer against its own insured."  16 Couch on Insurance § 224:1. "[K]nown by the somewhat overbroad name of

'the antisubrogation rule,'" the prohibition "extends to forbid subrogation against those persons . . . holding the status of an additional insured or coinsured," including "pursuant to a separate agreement requiring the insured to carry insurance for the benefit of another," as long as the claim "aris[es] from the very risk for which the insured was covered by that insurer." *Id.* (footnotes omitted).   Although subrogation may be waived through a contractual provision, the anti-subrogation rule is, itself, not a creature of contract, but one of public policy. *See, e.g.*, *Lloyd's Syndicate 457 v. FloaTEC, LLC*, 921 F.3d 508, 522 (5th Cir. 2019).  It is motivated, in part, by the "public policy consideration[ ]" that an insurer that has accepted premiums to cover a risk should not be allowed to avoid consequent losses by recovering them from an insured party. *See* 16 Couch on Insurance § 224:3.

Paddock's position is that the rule functions to bar both of the claims asserted here—that is, the breach of contract claim and the negligence claim brought by Plaintiffs as subrogees of each of the LaSalle Entities.  ECF No. 62-1 at 18–23.  Plaintiffs counter first that "Paddock offers no proof that it [was] an insured under Plaintiffs' policies."  ECF No. 66 at 19.  Further, they argue that, to the extent Paddock was an insured pursuant to the Renovation Contract, the anti-subrogation rule would bar (1) only claims brought by Plaintiffs as subrogees of DC I&G (and not the claims brought as, for example, subrogees of I&G) and (2) only claims to Work property. *Id.* at 19–22.

Plaintiffs make their first point—that Paddock has not shown that it is an "insured"—in a single sentence without citation to authority.  The argument will be deemed forfeited. *See, e.g.*, *United States v. TDC Mgmt. Corp.*, 827 F.3d 1127, 1130 (D.C. Cir. 2016) (finding an argument forfeited  where the party "does not further develop it (or even mention it again) after [a] 'single

conclusory statement'" (quoting *Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008))); *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013).

Even if it were not forfeited, authority establishes that, to determine whether an entity not named in an insurance policy is, indeed, an additional insured, courts should look to the contracts at issue—that is, both the agreement between the insured and the putative third-party and the insurance policy—to determine "the reasonable expectations of the parties." *Rausch v. Allstate Ins. Co.*, 882 A.2d 801, 814–15 (Md. 2005) (looking to the lease between a landlord and tenant to determine that the tenant was an insured under the landlord's fire insurance policy); *see also, e.g.*, *AGIP Petroleum Co. v. Gulf Island Fabrication, Inc.*, 920 F. Supp. 1318, 1325–26 (S.D. Tex. 1996) (looking to provisions of the contract between insured and contractor and of the insurance policy to determine that the contractor should be deemed an insured under the insurance policy); *Sherwood Med. Co. v. B.P.S. Guard Servs.*, 882 S.W.2d 160, 162 (Mo. Ct. App. 1994) (same, to determine whether a subcontractor was insured under the policy); *Olinkraft, Inc. v. Anco Insulation, Inc.*, 376 So.2d 1301, 1302–03 (La. Ct. App. 1979) (same, with a contractor); *S. Tippecanoe Sch. Bldg. Corp. v. Shambaugh & Son, Inc.*, 395 N.E.2d 320, 354–55, 362 (Ind. Ct. App. 1979) [hereinafter, *South Tippecanoe*] (looking to the contract between a building owner and its general contractor that required the owner to maintain all-risk insurance including the interests of the contractor and subcontractors and to that all-risk insurance policy to determine that a subcontractor was an additional insured under the policy). Here, as discussed above, DC I&G and Paddock signed an agreement in which DC I&G committed to provide property insurance that would (at least) cover the Work, including the interests of Paddock. ECF No. 62-5 at 7. The Renovation Contract also waived DC I&G's right to subrogate claims that were covered by that property insurance. *Id.* DC I&G relied on its existing all-risk property insurance—the Insurance

27

Policy—to satisfy the dictates of the Renovation Contract.  The Insurance Policy itself was written to contemplate such a situation, as it extends coverage to "[c]ontractors' and/or subcontractors' . . . interests in property covered to the extent of the Insured's liability imposed by law or assumed by contract."  ECF No. 62-15 at 10.   More, the policy affirms that the insured parties retain the right to recover under the Insurance Policy notwithstanding "[a]ny release from liability entered into . . . prior to loss."  *Id.* at 27.   Thus, the parties intended for Paddock to be covered by the Insurance Policy, and Paddock, although not named, was coinsured under the policy.  *See, e.g.*, 16 Couch on Insurance § 224:1 & n.6 (collecting cases affirming the proposition that "[w]here insured is required by contract or lease to carry insurance for benefit of another, other party may attain status of coinsured . . . in absence of design or fraud on part of coinsured"); *South Tippecanoe*, 395 N.E.2d at 354–60 (finding as a matter of law that contractors and subcontractors on a school construction building governed by a contract similar to the one here were intended insureds under a builder's all-risk policy with coverage provisions similar to the policy at issue here).  Indeed, Plaintiffs appear to recognize this, asserting that, "because they step into the shoes of DC I&G, the terms of the [Renovation] Contract," which includes the requirement that DC I&G provide property insurance, "apply to Plaintiffs' claims—as subrogee of DC I&G—against Paddock."  ECF No. 66 at 20 (internal citation omitted).

Plaintiffs make two slightly more developed arguments seeking to avoid the application of the anti-subrogation rule to the LaSalle Entities other than DC I&G.  First, they contend that "Paddock cannot be considered an insured under [ ] Plaintiffs' [Insurance Policy]" with regard to any entity other than DC I&G because DC I&G was "the only Insured that could have assumed Paddock's liability by contract."  *Id.* at 19.  As support, they cite a provision from the Insurance Policy stating that, "[e]xcept with respect to limits of liability and deductible amounts, the terms

of the policy shall apply separately to each person or organization covered as Insured in the same manner and to the same extent as though a separate policy had been issued to each such person or organization." *Id.*; *see also* ECF No. 62-15 at 31.  However, in determining whether two entities are insured under the same policy for purposes of the anti-subrogation rule, courts have looked to the realities of the relationship among the insurer and the insured entities, rather than mere formalities.  So, for example, in *North Star Reinsurance Corp. v. Continental Insurance Corp.*, New York's highest court found that two policies, each naming a different insured, were "integrally related and indistinguishable from a single policy in any relevant way" because they were issued by the same insurer at the same time and covered the same risk.  624 N.E.2d 647, 653–54 (N.Y. 1993).  Similarly, in *AGIP Petroleum*, the court indicated that the anti-subrogation rule would bar a suit by the subrogated insurer of a petroleum company against a contractor who qualified as an "other assured" under the policy, even though that policy contained a provision that the insurance would "be deemed to be a separate insurance in respect of each Assured [ ] (as if a separate policy had been issued to each)."  920 F. Supp. at 1325–26.  Plaintiffs have provided no reason to consider the single policy here as separate policies.  Indeed, the undisputed evidence indicates that Plaintiffs themselves did not consider each insured to be covered by a separate policy.  Plaintiffs repeatedly assert that I&G (which owned the hotel and leased it to DC I&G) was the entity damaged by the incident.  ECF No. 66 at 19.  However, the insurance proceeds were paid out to LaSalle, not I&G or even DC I&G.  ECF No. 62-1 at 3; ECF No. 62-12; ECF No. 66 at 6.  Paddock and the insured subrogors—each of the LaSalle Entities upon whose behalf Plaintiffs sue—are therefore insured under the same policy.

Plaintiffs' second argument—that DC I&G did not agree by contract to insure damage to non-Work property and therefore the anti-subrogation doctrine, which "applies only 'for a claim

arising from the very risk for which the insured was covered" does not affect the claims here (ECF No. 66 at 20 (quoting *N. Star Reins. Corp. v. Cont'l Ins.*, 82 N.Y.2d 281, 296) (N.Y. 1993))—fares no better.  First, as noted above, by relying on its existing all-risk property insurance policy to satisfy the dictates of the Renovation Contract, DC I&G *did* agree to insure damage to non-Work property.  And the Insurance Policy itself evinces an intention to assume the risk of a contractor's negligence by covering "[c]ontractors' and/or subcontractors' . . . interests in property . . . to the extent of the Insured's liability . . . assumed by contract" and insured against "all risks of direct physical loss of or damage to property" even where the parties to that contract had waived claims against each other (and thus waived subrogation).   ECF No. 62-15 at 10, 21.

A leading case, *Baugh-Belarde Construction Co. v. College Utilities Corp.*, aptly explains the concept.  There, Baugh-Belarde Construction Co. ("Baugh-Belarde"), the contractor charged with constructing faculty housing for the University of Alaska maintained an insurance policy that covered one of its subcontractors, College Utilities Corp., "to the extent of [its] interest in the project."  *Baugh-Belarde*, 561 P.2d 1211, 1212 (Alaska 1977).   When a fire damaged the construction, the contractor—on behalf of the insurer—sought recompense for the loss amount, "alleging that College Utilities had breached its contract and that College Utilities' negligence had caused the fire."  *Id.* at 1212–13.  The court recognized that the language of the insurance policy "provided that subcontractors were insured 'only as regards [their] property,' and were included 'as their interests may appear.'"  *Id.* at 1213 (alteration in original) (quoting the insurance policy).  Nevertheless, the court rejected the plaintiff's argument that the subcontractor's "immunity from liability [due to the anti-subrogation rule was] limited to the amount of loss to its own property in the construction project."  *Id.*   It reasoned that, "by accepting the premiums for [the subcontractors'] inclusion as co-insureds under said policy," the insurance company "assumed the

risk of any loss occasioned by [the subcontractors'] negligence. . . . The builder's risk policy obtained by Baugh-Belarde protected each insured party against his own negligence, whether the property lost belonged to him or to some other insured party." *Id.* at 1214 (first alteration in original) (quoting *New Amsterdam Cas. Co. v. Homans-Kohler, Inc.*, 305 F. Supp. 1017, 1020 (D.R.I. 1969)). The court pointed to several policy considerations as support for its decision, including reduction of litigation—because "[i]f an insurer on a major construction job were able to recover from one or more of its insureds, most losses on construction jobs would result in costly litigation," which would "ultimately be passed on to the general public in the form of increased insurance premiums and higher construction costs"—and "the tremendous burden which would be placed on subcontractors," which would be "forced to protect against liability for loss to the entire project by paying huge premiums for [their] own liability insurance," consequently "increas[ing] the entire cost of the construction project[s]." *Baugh-Belarde*, 561 P.2d at 1215. The court concluded that "the insurer could not recover through subrogation from a subcontractor which was insured under its builder's risk policy." *Id.* at 1216.

Other courts have followed the lead of *Baugh-Belarde*. Of particular note is the decision in *South Tippecanoe*, where the court was faced with a situation very similar to the one presented here. In that case, the contract to build a school required the owner (South Tippecanoe) to "purchase and maintain property insurance upon the entire Work at the site to the full insurable value thereof" and to "include the interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors." *South Tippecanoe*, 395 N.E.2d at 323 (quoting the construction contract). It also included a subrogation waiver worded similarly to Section 17.6 in the Renovation Contract. *Id.* at 324. The insurance policy, which named only South Tippecanoe as an insured, covered the building while under construction, as well as "builders' machinery, tools and equipment owned by

31

the insured or similar property of others for which the insured is legally liable." *Id.* (quoting insurance policy). It further contained a provision that the policy was not invalidated "should the Insured waive in writing prior to a loss to the described property any or all right of recovery against any entity for whom work is being performed, or against any subcontractor working on the job insured hereunder." *Id.* (quoting insurance policy). After a gas explosion damaged the construction, the insurer paid for the losses and sued, as subrogee of the owner, the allegedly negligent subcontractors to recover the loss amount. *Id.* at 322. Relying on *Baugh-Belarde* and "the weight of authority from other jurisdictions," the court held that, because "[t]he construction contract . . . explicitly required that the property insurance procured by South Tippecanoe include the interests of the various contracting parties," claims against those contractors (as "intended 'insured[s]' under the builder's risk insurance") were "not [ ] subject to subrogation." *Id.* at 327–33; *see also, e.g.*, *Harvey's Wagon Wheel, Inc. v. MacSween*, 606 P.2d 1095, 1096 (Nev. 1980) (holding that the anti-subrogation rule barred suit by an owner's insurer against subcontractors notwithstanding the fact the insurance policy stated that it insured the subcontractors "[a]s their interests may appear" (quoting the policy)); *Sherwood Med. Co.*, 882 S.W.2d at 163 (same, where "[t]he policy and Agreement afforded subcontractors coverage 'as their interests may appear'" and "did not limit coverage to a property interest alone"); *Olinkraft*, 376 So.2d at 1302–03 (same, where the construction contract required the owner to maintain insurance covering the "interest[s]" of the subcontractors and insurance policy stated that it covered "[c]ontractor's interest in property . . . to the extent of the Insured's liability therefor" (quoting the construction contract and the policy)). Here, as in *South Tippecanoe* and those other cases, the fact that the Renovation Contract "explicitly required that the property insurance procured by [DC I&G] include the interests of the various contracting parties" indicates that "the protection thereby afforded was

intended to constitute the exclusive source for redress of damages," a conclusion "buttressed by the waiver provisions discussed above." *South Tippecanoe*, 395 N.E.2d at 327. This result is fully in line with the precept that "[a]n insurer which accepts a premium based partially on the inclusion of a coinsured under a policy of insurance has assumed the risk of its negligence." *Bd. of Ed. of Jordan Sch. Dist. v. Hales*, 566 P.2d 1246, 1247 (Utah 1977); *see also, e.g.*, *Baugh-Belarde*, 561 P.2d at 1215 ("The entire loss should be borne by the insurer which has accepted one premium covering the entire property."); *cf. Pa. Gen. Ins. Co. v. Austin Powder Co.*, 68 N.Y.2d 465, 470–71 (rejecting the argument that the anti-subrogation rule was inapplicable because the additional insured did not itself pay premiums for the coverage because the costs for such premiums were likely priced in to the additional insured's contract with the primary insured).

The result, then, is that the anti-subrogation rule bars Plaintiffs (as subrogees of the insured LaSalle Entities) from maintaining this action against Paddock, who is also an insured under the Insurance Policy. In sum, the Renovation Contract itself, as a matter of law, bars Plaintiffs' breach of contract claim against Paddock (and any other claim brought as subrogee of DC I&G) and the anti-subrogation rule bars both the breach of contract and the negligence claims as to all LaSalle Entities. As noted, the Court need not and does not reach Paddock's legal argument as to the application of the economic loss rule or its factual argument that all LaSalle Entities should be deemed bound by the provisions of the Renovation Contract.

## IV.   ORDER

For the foregoing reasons, it is hereby

**ORDERED** that Plaintiffs' motion for partial summary judgment (ECF No. 60) is **DENIED**. It is further

**ORDERED** that Paddock's motion for summary judgment (ECF No. 62) is **GRANTED.** It is further

**ORDERED** that the claims against Paddock are **DISMISSED**.  It is further

**ORDERED** that on or before April 15, 2021, Paddock shall **SHOW CAUSE** why its claims against P&F should not be dismissed as moot.[12]

**SO ORDERED.**

Date:   April 1, 2021

_____
G. MICHAEL HARVEY
United States Magistrate Judge

---

[12] Paddock has not alleged any claims against Defendant Beall.